Patricia Jo KARDELL, Martin Murphy Snowden, Mickey Darrell Snowden, and Mary Delilla Snowden, Appellants

v.

Edwin V. ACKER Jr., Stephen Adolph Acker, Elaine Acker George, Sheila Acker (Reinke) Bonner, and Edwin Scott Acker, Appellees

No. 04–15–00534–CV

Court of Appeals of Texas, San Antonio.

Delivered and Filed: May 4, 2016

**838**

Wilson Calhoun, Law Office of Wilson Calhoun, Audrey Mullert Vicknair, Law Office of Audrey Mullert Vicknair, Corpus Christi, TX, Frederick R. Zlotucha, Law Office Of Frederick R. Zlotucha, San Antonio, TX, for Appellee.

Sitting: Karen Angelini, Justice, Rebeca C. Martinez, Justice, Patricia O. Alvarez, Justice

## OPINION

Opinion by: Patricia O. Alvarez, Justice

Patricia Jo Kardell, Martin Murphy Snowden, Mickey Darrell Snowden, and Mary Delilla Snowden (Snowden Heirs) appeal the trial court's judgment declaring that Edwin V. Acker Jr., Stephen Adolph Acker, Elaine Acker George, Sheila Acker (Reinke) Bonner, and Edwin Scott Acker (Acker Heirs) "own an undivided non-participating one-fifth of the whole and entire royalty interest in and to all of the oil, gas, and other minerals in" the real property Mabel M. Snowden acquired from Green Martin (Real Property). The Snowden Heirs contend the trial court erred in denying their summary judgment because the Acker Heirs owned only an undivided 1/5th of a 1/8th royalty interest in the Real Property. The Snowden Heirs also contend if this court reverses the trial court's judgment, they are entitled to an award of attorney's fees. We affirm the trial court's judgment.[1]

### BACKGROUND

Mabel M. Snowden and Johnie Lorene Acker were two of J.E. Murphy's five children. Murphy owned four ranches.[2] After Murphy died and pursuant to his

Richard J. Karam, Law Offices of Richard J. Karam, Gilbert Vara, Jr., The Law Office of Gilbert Vara, Jr., San Antonio, TX, for Appellant.

---

1. Because we affirm the trial court's judgment, we do not further address the Snowden Heirs' contingent issue regarding attorney's fees.

2. Mabel's heirs are referred to herein as the Snowden Heirs, and Johnie's heirs are referred to as the Acker Heirs.

wishes, the five children partitioned his property.

## A. Partition Deeds

In partitioning the property, the five children executed four partition deeds on October 21, 1948. Under these deeds, Johnie and the other three children were each deeded the surface estate to one of the four ranches. Mabel received cash because she already owned a ranch (the Snowden Ranch). The four partition deeds conveyed the surface estate to the grantee, and each deed contained a virtually identical provision regarding the mineral estate:

. . . it is expressly understood and agreed by each and all of the parties hereto that no part of the oil, gas, or other minerals in, on, or under the above described lands are hereby conveyed or are intended or affected by this instrument except as hereafter provided, and the parties hereto, . . . shall continue to own and hold in common all of the oil, gas, and other minerals in, on, and under all of the above described lands in the same undivided proportion that said parties now own and hold said oil, gas, and other minerals . . . [the owner of the surface estate] shall have the exclusive right to execute, without the joinder of any of the [other children], any oil, gas, or mineral lease that she desires on any such terms as she may desire, and receive, as her separate property, such bonuses, oil payments, and rentals as may be paid under said oil, gas, and mineral leases so executed by her, except that she shall reserve in each oil, gas, and mineral lease so executed by her a base one-eighth (1/8) royalty interest for the benefit of herself and the other four children of J.E. Murphy, deceased, grantors herein, in the same proportion they now own same.

On October 27, 1948, Mabel also executed a deed in which she conveyed to her four siblings the following:

. . . an undivided four-fifths (4/5ths) interest as their separate individual property so that each will hold an undivided one-fifth (1/5th) interest in and to all of the oil, gas and other minerals acquired by Mabel [in the Real Property],

The deed from Mabel further provided as follows:

It is distinctly understood and herein stipulated that all or part of said land is under an oil and gas lease made by the Grantors [Mabel and her husband] or their assignors providing for royalty of one-eighth (1/8th) of the oil and certain royalties and rentals for gas and other minerals and that the Grantees [the four siblings] herein shall receive four-fifths (4/5ths), the same being one-fifth (1/5th) to each Grantee as his or her separate property, of the royalties and rentals provided in said lease but said Grantees shall have no part of the annual rentals paid to keep said lease in force until drilling is begun.

It is further agreed that Grantees shall have no interest in any bonus money or oil payment above the one-eighth (1/8th) royalty received by the Grantors in any future lease or leases given on said land and that it shall not be necessary for the Grantees to join in any such lease or leases so made; that Grantees shall receive under such lease or leases four-fifths (the same being one-fifth (1/5th) to each Grantee) part of all the oil, gas and other minerals taken and saved under any such lease or leases and he or she shall receive the same out of the royalty provided for in such lease or leases, but Grantees shall have no part in the annual rentals paid to keep such lease or leases in force until drilling is begun[.]

## B. Declaration and Agreement

On December 9, 1953, Johnie, Mabel, and their other three siblings executed a declaration and agreement noting a question had arisen with regard to the four partition deeds. In order to clarify those deeds, the declaration and agreement stated:

... it was the intention of said parties to grant to the party receiving the surface, the right to receive all rentals from oil, gas and mineral leases then on said land so granted and to receive all bonuses and rentals on leases that might thereafter be made by the party to whom said surface was conveyed by Special Warranty Deed, provided, however, that the Lessor in said oil, gas and mineral lease, so executed by him or her, should reserve, in each oil, gas and mineral leases so executed, a basic one-eighth (1/8) royalty interest (if all royalty interest was owned by J.E. Murphy at the time of his death, then a full 1/8th royalty would be reserved; otherwise a proportion of 1/8th reserved) for the benefit of the Lessor and the other children of J.E. Murphy deceased.... ·

## C. Conveyance to Mabel, Reconveyance to Siblings

Subsequently, Mabel needed to obtain a loan; however, the bank required her to own 3/5ths of the mineral interest in the Real Property. Accordingly, on December 31, 1953, Johnie and another sibling signed a deed conveying to Mabel the following:

...an undivided two-fifths (2/5ths) interest ... in and to all of the oil, gas and other minerals in and to the [Real Property], the mineral interest hereby conveyed being all of the interest conveyed by Mabel M. Snowden to Johnie Lorene Acker and [the other sibling] by Deed dated October 27, 1948,....

After Mabel repaid the loan in 1965, she executed a deed re-conveying to Johnie:

...[an] undivided one-fifth (1/5) interest as her separate, sole and individual property in and to all of the oil, gas and other minerals in and to the [Real Property], the mineral interest hereby conveyed being all of the interest conveyed by Johnie Lorene Acker to Mabel M. Snowden by deed dated December 31, 1953,....

## D. Correction Deed

In 1980, however, Johnie and Mabel agreed to correct the 1965 deed to clarify that the interest conveyed in the 1965 deed was a non-participating royalty interest and not a mineral interest. As a result, Mabel and Johnie executed a correction warranty deed conveying to Johnie "an undivided non-participating one-fifth (1/5) of the whole and entire royalty interest as her separate, sole and individual property in and to all of the oil, gas and other minerals in the [Real Property]." The 1980 deed further stated as follows:

This Deed is made in place of and as a Deed of Correction of a Deed executed by Grantors [Mabel and her husband] herein to Grantee, dated March 25, 1965, and recorded in Vol. 135, Pages 135–136, Deed Records of La Salle County, Texas, wherein by error or mistake, Grantors conveyed to Grantee an undivided 1/5th mineral interest in and to all of the oil, gas and other minerals, when in truth and fact Grantors should have conveyed an undivided non-participating 1/5th of the whole and entire royalty interest, and this instrument is made by Grantors and accepted by Grantee in order to correct said mistake, and in all other respects confirming said former Deed, and it shall be effective as of and retroactive to March 25, 1965.

In 2009, Swift Energy Operating, LLC entered into an oil and gas lease with the Snowden Heirs. Sometime thereafter, the dispute arose between the Snowden Heirs and the Acker Heirs regarding the royalty to which the Acker Heirs were entitled. As a result, Swift Energy filed an interpleader action and deposited the disputed royalty payment into the court's registry. The Snowden Heirs and Acker Heirs filed competing motions for summary judgment, and the trial court granted the Acker Heirs' motion and declared the Acker Heirs "own an undivided nonparticipating one-fifth of the whole and entire royalty interest in and to all of the oil, gas, and other minerals" in the Real Property. The Snowden Heirs appeal.

## STANDARD OF REVIEW

■ We review a summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex.2003). We consider all the evidence in the light most favorable to the respondent, indulging all reasonable inferences in favor of the respondent, and determine whether the movant proved that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). "When both sides move for summary judgment and the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides and determine all questions presented." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex.2009). In such a case, "we render the judgment [that] the trial court should have rendered." *Id.*

## ISSUES ON APPEAL

In asserting the trial court erred in denying their motion for summary judgment, the Snowden Heirs first contend this court's prior decision in *Winslow v. Acker*, 781 S.W.2d 322 (Tex.App.–San Antonio 1989, writ denied), governs the construction of the 1980 correction deed and should be given res judicata or collateral estoppel effect. The Snowden Heirs next contend this court should consider all of the deeds in the chain of title from Mabel to Johnie in construing the 1980 correction deed. We address each of these issues in turn.

## RES JUDICATA, COLLATERAL ESTOPPEL

■ The Snowden Heirs first contend that this court's prior opinion in *Winslow v. Acker* constitutes res judicata or collateral estoppel with regard to the issues presented in this appeal. *See id.* We disagree.

■ The judicial doctrines of res judicata and collateral estoppel preclude parties from relitigating issues that were already decided in a prior lawsuit. *In re Team Rocket, L.P.*, 256 S.W.3d 257, 260 (Tex. 2008).

In *Winslow*, this court construed the four 1948 partition deeds and the interest conveyed under those deeds. *See Winslow*, 781 S.W.2d at 325–27. Although the appellants in that case made an argument regarding the deed Mabel executed on October 27, 1948, this court did not address the argument. *Id.* at 325. Instead, the court noted that because it disagreed with the appellants' contention that the partition deeds were ambiguous, "appellants' argument concerning the application of the Acker Partition Deed to the Snowden Deed is moot." *Id.* Because this court did not construe Mabel's 1948 "Snowden Deed" in the *Winslow* opinion, that opinion has no res judicata or collateral estoppel effect on the outcome of the instant appeal. *See In re Team Rocket, L.P.*, 256 S.W.3d at 260.

We next discuss whether the trial court erred in construing the 1980 correction deed as conveying to Johnie "an undivided non-participating one-fifth of the whole and entire royalty interest in and to all of the oil, gas, and other minerals in" the Real Property.

### CONSTRUCTION OF 1980 CORRECTION DEED

The Snowden Heirs next contend the trial court erred in construing the 1980 correction deed because the conveyance therein was intended to convey the same interest Mabel conveyed to Johnie in the 1948 deed. The Snowden Heirs rely on the reference in the 1980 correction deed to the 1965 deed which referenced the 1953 deed which referenced the 1948 deed. The Acker Heirs contend this court should only consider Mabel's intent as expressed in the four corners of the 1980 correction deed.

### A. Deed Construction

■ Because the construction of an unambiguous deed is a question of law, we review the trial court's construction of a deed de novo. *Stribling v. Millican DPC Partners, LP,* 458 S.W.3d 17, 20 (Tex. 2015); *Medina Interests, Ltd. v. Trial,* 469 S.W.3d 619, 622 (Tex.App.–San Antonio 2015, pet. denied). Our primary duty in construing a deed is to ascertain the intent of the parties from all of the language in the "four corners" of the deed. *Luckel v. White,* 819 S.W.2d 459, 461–62 (Tex.1991); *Medina Interests,* 469 S.W.3d at 622. "We discern the parties' intent from the deed's language in its entirety," harmonizing and giving effect to all parts of the deed so no provision is rendered meaningless. *Stribling,* 458 S.W.3d at 20; *accord Medina Interests,* 469 S.W.3d at 622. "To discern intent, words and phrases must be construed together and in context, not in iso-

lation." *Hysaw v. Dawkins,* 483 S.W.3d 1, 13, 2016 WL 352229, at *8 (Tex.2016).

### B. Four Corners of the Correction Warranty Deed

■ In this case, the parties agree that after the 1980 correction deed, the Acker Heirs owned a non-participating royalty interest. The parties disagree about the percentage of that interest.

The 1980 correction deed unambiguously conveys to Johnie "an undivided one-fifth (1/5) of the whole and entire royalty interest as her separate, sole and individual property in and to all of the oil, gas and other minerals" in the Real Property. The 1980 correction deed states it was issued because the 1965 deed "by error or mistake" conveyed to Johnie "an undivided 1/5th mineral interest in and to all of the oil and gas and other minerals" when it should have conveyed "an undivided non-participating 1/5th of the whole and entire royalty interest." Therefore, applying the rules of construction to the four corners of the deed, we conclude the 1980 correction deed conveyed an undivided one-fifth of the "whole and entire" royalty interest, and not, as the Snowden Heirs contend, an undivided 1/5th of a 1/8th royalty interest.

### C. Consideration of Mabel's 1948 Deed, Johnie's 1953 Deed, and Mabel's 1965 Deed

Even if we were to accept the invitation by the Snowden Heirs to venture outside the four corners of the 1980 correction deed and consider all of the deeds in the chain from Mabel to Johnie, the result would not change. *Compare Graham v. Prochaska,* 429 S.W.3d 650, 662–63 (Tex. App.–San Antonio 2013, pet. denied) (considering deeds in chain of title in construing deed), *with Hausser v. Cuellar,* 345 S.W.3d 462, 469–70 (Tex.App.–San Antonio 2011, pet. denied) (disapproving prior opin-

ion's consideration of deed in chain of title rather than relying on four corners of deed being interpreted). The Snowden Heirs believe that if this court considers Mabel's original 1948 deed, we would accept their position that the 1948 deed conveyed an undivided 1/5th of a 1/8th royalty interest. We disagree because our construction of Mabel's 1948 deed is governed by this court's prior decision in *Garza v. Prolithic Energy Co., L.P.,* 195 S.W.3d 137 (Tex. App.–San Antonio 2006, pet. denied).

### 1. Garza v. Prolithic Energy Co., L.P.

In *Garza,* this court was required to construe a contract substantially similar to Mabel's 1948 deed. The granting clause of the contract conveyed "an undivided one-half (1/2) interest in and to all of the oil, gas and other minerals in and under the" property in question.[3] *Id.* at 139. The contract's existing lease clause noted the property was under an existing lease that provided for a 1/8th royalty, and the grantee would receive one-half of the royalties and rentals provided in that lease but no part of any annual rentals. *Id.* Finally, the future lease clause in *Garza* provided that the grantee would have no interest in any bonus money received by the grantor under future leases, and it was not necessary for the grantee to join in any future leases; however, the grantee would receive one-sixteenth (1/16th) of all oil, gas and other minerals taken and saved under such future leases, and would receive the same out of the royalty provided for in such future leases but would have no part in any annual rentals. *Id.* at 139–40.

The *Garza* court noted the five essential attributes of a severed mineral estate are (1) the right to develop or the right to ingress and egress; (2) the right to lease or the executive right; (3) the right to receive bonus payments; (4) the right to receive delay rentals; and (5) the right to receive royalty payments. *Id.* at 142 (citing *Altman v. Blake,* 712 S.W.2d 117, 118 (Tex.1986)). *Garza* further noted the Texas Supreme Court "has recognized that 'a mineral interest shorn of the executive right and the right to receive delay rentals remains an interest in the mineral fee.' " *Id.* (quoting *Altman,* 712 S.W.2d at 118–19). After examining the Texas Supreme Court's analysis in another case, the *Garza* court held the contract in question conveyed a mineral interest although it reserved at least the second, third, and fourth *Altman* rights, and possibly also the first *Altman* right. *Id.* The court based its holding on the phrase "in and under" referring to a mineral interest and the fact that the reservation of the *Altman* rights would have been redundant if the contract conveyed a royalty interest. *Id.* The court then was required to address the effect of the conflicting fractions in the granting clause and the future lease clause and reasoned that the conflict arose from the development of the three-grant or multi-clause lease and due to the typical royalty at the time being 1/8th. *Id.* at 143–46. Acknowledging the effect of this development, the court harmonized the contract provisions and held the 1/2 interest in the mineral estate entitled the grantee to consistently receive 1/2 in whatever royalty was paid under the future leases. *Id.* at 145–46.

### 2. Application of Garza

Like the contract in *Garza,* the granting clause in Mabel's 1948 deed conveys to the four grantees "an undivided four-fifths (4/5ths) . . . in and to all the oil, gas and other minerals" Mabel acquired in the

---

3. In *Garza,* the court construed two separate conveyances. *Garza,* 195 S.W.3d at 139–40. Because the court reached the same result with regard to both instruments, for simplicity, we limit our reference to the first conveyance.

Real Property. *Cf. Garza*, 195 S.W.3d at 139–40. Similarly, Mabel's 1948 deed contains an existing lease clause recognizing the Real Property was subject to an oil and gas lease providing for a one-eighth royalty and that the grantees would receive four-fifths of the royalties and rentals provided under the lease but none of the annual rentals. *Cf. id.* Finally, the future lease clause, like the contract in *Garza*, states the grantees shall have no interest in any bonus money, and it was not necessary for the grantees to join future leases. *Cf. id.* Unlike the contract in *Garza*, however, the future lease clause in Mabel's 1948 deed does not contain the same type of conflicting fraction between the granting clause and the future lease clause present in the *Garza* contract. *Cf. id.* Instead, the future lease clause in Mabel's 1948 deed contains a possible conflict within the future lease clause by first stating the grantees shall not have an interest in any oil payment above the one-eighth royalty received by the grantors in any future leases, but then stating the grantees shall receive under the future leases four-fifths part of all the oil, gas and other minerals taken and saved under the future lease to be received out of the royalty provided in such lease or leases.

Applying the reasoning in *Garza*, we conclude Mabel's 1948 deed clearly conveyed to the grantees a four-fifths mineral interest shorn of various *Altman* rights. Just as the *Garza* court resolved the conflicting fraction in that case to hold the 1/2 interest in the mineral estate entitled the grantee to consistently receive 1/2 of whatever royalty was owed under the future leases, we believe the future lease clause in Mabel's 1948 deed also would entitle each of the four grantees to consistently receive 1/5th of whatever royalty is owed under the future leases. This interpretation is consistent with the 1953 deed in which Johnie conveyed to Mabel an unqualified 1/5th mineral interest, the 1965 deed in which Mabel conveyed to Johnie an unqualified 1/5th mineral interest, and the 1980 correction deed in which Mabel conveyed to Johnie a non-participating one-fifth of the "whole and entire royalty interest."

### 3. Deed Conveyed One–Fifth of Entire Royalty

Because Mabel's 1948 deed conveyed to Johnie a 1/5th mineral interest, Johnie's 1953 deed also conveyed to Mabel a 1/5th mineral interest and expressly recited the "mineral interest" being conveyed therein was the same interest previously conveyed to Johnie from Mabel. This express recognition that the conveyance was a "mineral interest" was then also referenced in the 1965 deed. The putative problem with the 1965 deed was that it conveyed the mineral interest without stating it was shorn of the various *Altman* rights previously retained in Mabel's 1948 deed. Although the parties chose to correct the perceived problem by executing the 1980 correction deed which thereafter limited Johnie's interest to a non-participating royalty interest rather than a non-participating mineral interest, even if we consider Mabel's 1948 deed in interpreting the 1980 correction deed, the percentage interest conveyed to Johnie under the 1948 deed was an undivided one-fifth of the whole and entire royalty interest owed under future leases, not an undivided 1/5th of a 1/8th royalty interest.

### CONCLUSION

Having reviewed the summary judgment evidence under the applicable standard of review, we conclude the 1980 correction deed unambiguously conveyed to Johnie "an undivided one-fifth (1/5) of the whole and entire royalty interest ... in and to all of the oil, gas and other minerals" in the

Real Property. Thus, the trial court's judgment is affirmed.